**FILED**
CLERK, U.S. DISTRICT COURT
4/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ASI___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>SHUO CHANG,<br>   aka "Calvin Chang,"<br><br>    Defendant. | Case No.  2:25-cr-00295-SB<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy;<br>31 U.S.C. § 5317: Criminal Forfeiture] |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Federal Reporting Requirements

1.   Under relevant federal law, a "financial institution," as that term is defined in Title 31, United States Code, Section 5312(a)(2)(R), included a business operating as an informal money transfer system to facilitate the transfer of money domestically or internationally outside of the conventional financial institutions system.

2.   Under federal law, whenever a financial institution received over $10,000 in currency in one transaction or two or more

related transactions that occurred within one day, the financial institution was required to file a Currency Transaction Report ("CTR") no later than 15 days after the transaction over $10,000. If the person who was depositing or withdrawing the currency did not want such a report to be filed, they might try to evade that filing by either making deposits under the $10,000 reporting threshold or taking other steps such as purchasing cashier's checks with the currency under the belief that such purchases need not be reported.

3. Under federal law, 31 U.S.C. § 5325, domestic financial institutions, including nonbank financial institutions, were required to maintain records of the following information in the case of any sale of money orders in the amount of $3,000 or more: The purchaser's name, address, social security number or alien identification number and date of birth. Title 31, U.S.C. § 5325 was promulgated by 31 C.F.R. § 1010.415, which states that no financial institution may issue or sell a bank check or draft, cashier's check, money order or travelers check for $3,000 or more in currency unless it maintains records of the information listed above (purchaser's name, etc.).

4. Under federal law, whenever a nonfinancial trade or business received over $10,000 in currency in one transaction or two or more related transactions that occur within one year, the business was required to file a notice with the Secretary of the Treasury known as an IRS Form 8300 ("Form 8300") no later than 15 days after the transaction over $10,000.

5. Under federal law 31 C.F.R. § 1010.100(ff)(5)(i), a "money transmitter" was a person that provided money transmission services by accepting currency, funds, or other items of value that substitute for currency from one person and transmitting that currency, funds or

other items of value that substitute for currency to another location or person by any means, including through a financial institution, an electronic funds transfer network, or an informal value transfer system; or, any other person engaged in the transfer of funds. A "money transmitter" was required to be licensed by both federal and state law, and failure to register under either federal or state law was a federal offense under 18 U.S.C. § 1960.

Trade-Based Money Laundering

6. Trade-Based Money Laundering ("TBML") was a system of informal value transfer that exploited legitimate businesses and trade systems to launder the proceeds of illegal activity. TBML in the drug trafficking context operated as follows:

   a. Drug trafficking conducted within the United States generated large quantities of United States currency ("drug proceeds"), which had to be transferred in some manner to the true owners of that currency, that is, the individuals in other countries who were the sources of the illegal drugs.

   b. Drug traffickers and others who committed illegal acts in the United States were aware that banks and other financial institutions were required to file CTRs that included the name and identification of the beneficial owner or owners of those funds for any transaction in United States currency in excess of $10,000 and frequently tried to evade these reporting requirements.

   c. In addition, drug traffickers were alert to the high costs of using the conventional banking system, which could include exchange fees when exchanging dollars for pesos and/or wire transfer fees.

    d. In order to evade the high costs of transfer and the government reporting that accompanied the deposit of large amounts of currency into the legitimate banking system, drug traffickers sought other methods of integrating the drug proceeds they accumulated in United States currency into the legitimate financial system so that it could be transferred to the true owners without detection.

    e. Criminal actors such as drug traffickers typically employed brokers or "money consolidators" who each operated as an informal bank where drug traffickers could place their accumulated drug proceeds, typically at lower exchange rates and for lesser fees than those at legitimate financial institutions.

    f. Brokers and money consolidators sought out businesses and individuals in other countries who purchased merchandise in the United States and needed U.S. dollars to pay for that merchandise.

    g. The dollars were sold in the black market for pesos and used to pay the open invoices of the businesses and individuals who had purchased goods in the United States.

    h. When the purchased goods were shipped to the country of the purchaser and sold, the proceeds of those sales were then relinquished to the owner of the drug proceeds in the country where the drugs originated, that is, the drug trafficker whose product generated the United States currency, thus enabling the drug trafficker to avoid the physical transfer of currency across the border and the accompanying risks of seizure and robbery.

<u>Vinpower</u>

  7. Vinpower Digital Inc. ("Vinpower") was a business located at 817 S. Palm Avenue, Alhambra, California, within the Central District of California, that sold digital media duplicators, digital

4

storage, blank media, and other similar devices.  Defendant SHUO CHANG, also known as "Calvin Chang," was the Chief Executive Officer, Secretary, and Director of Vinpower.  Co-Conspirator 1 was the Chief Financial Officer of Vinpower.

Bank Accounts Used to Deposit Drug Proceeds

8.   Defendant CHANG, Co-Conspirator 1, and others known and unknown to the United States Attorney, opened, maintained, and used the following bank accounts in the layering and integration of drug proceeds:

   a.   CTBC account number ending -9038 ("CTBC 9038");
   b.   EverTrust account number ending -1869 ("EverTrust 1869"); and
   c.   Cathay Bank account number ending -6131 ("Cathay 6131").

B.   OBJECT OF THE CONSPIRACY

9.   Beginning on a date unknown, but no later than March 2018, and continuing to on or about September 29, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHANG, and others known and unknown to the United States Attorney, conspired and agreed with each other to knowingly structure and assist in structuring transactions at domestic financial institutions, in violation of Title 31, United States Code, Section 5324(a)(3).

C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

10.   The object of the conspiracy was to be accomplished, in substance, as follows:

       a.    Defendant CHANG, Co-Conspirator 1, and an employee of Vinpower ("Co-Conspirator 2"), would accept contracts from the owners of drug proceeds requiring that they would receive United States currency and integrate that currency into the legitimate banking system in exchange for a commission-based fee that was a percentage of the amount transferred.  To facilitate the process of entering the drug proceeds into the legitimate banking system, defendant CHANG and Co-Conspirator 1 would open and maintain bank accounts they controlled.

       b.    Co-Conspirator 2 and a co-conspirator ("Co-Conspirator 3") would arrange for a courier to deliver drug proceeds to Vinpower to pay invoices for products sent to Mexico-based customers.

       c.    Co-Conspirator 2 and others known and unknown to the United States Attorney would receive large amounts of United States currency at Vinpower exceeding $10,000 as payment for open invoices from its customers.

       d.    Co-Conspirator 2 and others known and unknown to the United States Attorney would fail to file reports of currency transactions exceeding $10,000 to the Internal Revenue Service on a Form 8300 as required by law.

       e.    Co-Conspirator 1 and others known and unknown to the United States Attorney would count and maintain the drug proceeds at Vinpower.

       f.    Defendant CHANG and Co-Conspirator 2 would direct Co-Conspirator 2 and others to purchase, with the cash received by couriers of drug proceeds, money orders below $3,000 to avoid the requirement by law that financial institutions maintain records of the following information in the case of any sale of money orders in

1 the amount of $3,000 or more: the purchaser's name, address, social
2 security number or alien identification number, and date of birth.
3        g.   Co-Conspirator 2 would purchase money orders with drug
4 proceeds below $3,000 in order to avoid reporting requirements.
5        h.   Co-Conspirator 1 would stamp the names of Mexico-based
6 customers on the purchased money orders.
7        i.   Co-Conspirator 1, and others known and unknown to the
8 United States Attorney, would deposit the money orders for Mexico-
9 based customers into bank accounts controlled by Vinpower, namely,
10 CTBC 9038, EverTrust 1869, and Cathay 6131.
11       j.   Defendant CHANG, Co-Conspirator 1, and others known
12 and unknown to the United States Attorney, would wire transfer the
13 funds to accounts of businesses, including a business in China
14 ("Company 1"), to pay for goods that were then shipped to Vinpower,
15 and ultimately sent to Mexico, where the proceeds of the sales of
16 those goods would be returned to the original owners of drug proceeds
17 delivered to Vinpower.

D.   OVERT ACTS

     11.  In furtherance of the conspiracy, and to accomplish the object of the conspiracy, on or about the following dates, defendant CHANG, and others known and unknown to the United States Attorney, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

     Overt Act No. 1:  On April 2, 2020, Co-Conspirator 1, using coded language in a LINE application message conversation, asked Co-Conspirator 2 to pick up cash to purchase money orders for the next day.

<u>Overt Act No. 2</u>:  On May 7, 2021, Co-Conspirator 1 initiated a wire transfer of approximately $46,020 from CTBC 9038 to a bank account controlled by Company 1.

<u>Overt Act No. 3</u>:  On May 20, 2020, Co-Conspirator 1, using coded language in a LINE application message conversation, asked Co-Conspirator 2 to purchase $1,725 worth of money orders.

<u>Overt Act No. 4</u>:  On May 21, 2021, Co-Conspirator 1 initiated a wire transfer of approximately $32,484 from CTBC 9038 to a bank account controlled by Company 1.

<u>Overt Act No. 5</u>:  On June 11, 2021, Co-Conspirator 1 initiated a wire transfer of approximately $55,255.50 from EverTrust 1869 to a bank account controlled by Company 1.

<u>Overt Act No. 6</u>:  On June 24, 2021, Co-Conspirator 1 initiated a wire transfer of approximately $24,120 from EverTrust 1869 to a bank account controlled by Company 1.

<u>Overt Act No. 7</u>:  On September 8, 2021, Co-Conspirator 2 and a courier of drug proceeds, using coded language in a text message conversation, coordinated the delivery of drug proceeds to Vinpower.

<u>Overt Act No. 8</u>:  On September 22, 2021, Co-Conspirator 2 and a courier of drug proceeds, using coded language in a text message conversation, coordinated the delivery of drug proceeds to Vinpower.

<u>Overt Act No. 9</u>:  On September 23, 2021, Co-Conspirator 2 and Co-Conspirator 3, using coded language in a WhatsApp messenger conversation, discussed the deliveries of $50,000 and $51,000 of drug proceeds to Vinpower.

<u>Overt Act No. 10</u>:  On September 23, 2021, Co-Conspirator 2 received over $10,000 on behalf of Vinpower and failed to file a

1  report of a currency transaction exceeding $10,000 to the Internal
2  Revenue Service on a Form 8300.
3      <u>Overt Act No. 11</u>:  On October 18, 2021, in Los Angeles County,
4  within the Central District of California, Co-Conspirator 2 purchased
5  three separate money orders in the amounts of $1,000, $1,000, and
6  $700, to avoid financial institution reporting requirements.
7      <u>Overt Act No. 12</u>:  On November 29, 2021, Co-Conspirator 2 and a
8  courier of drug proceeds, using coded language in a text message
9  conversation, coordinated the delivery of $73,000 of drug proceeds
10 drug proceeds to Vinpower.
11     <u>Overt Act No. 13</u>:  On November 29, 2021, Co-Conspirator 2 and
12 Co-Conspirator 3, using coded language in a WhatsApp messenger
13 conversation, discussed the delivery of $73,000 of drug proceeds to
14 Vinpower.
15     <u>Overt Act No. 14</u>:  On November 29, 2021, Co-Conspirator 2
16 received over $10,000 on behalf of Vinpower and failed to file a
17 report of a currency transaction exceeding $10,000 to the Internal
18 Revenue Service on a Form 8300.
19     <u>Overt Act No. 15</u>:  On January 24 and 25, 2022, Co-Conspirator 2
20 and a courier of drug proceeds, using coded language in a text
21 message conversation, coordinated the delivery of drug proceeds to
22 Vinpower.
23     <u>Overt Act No. 16</u>:  On February 14, 2022, in Los Angeles County,
24 within the Central District of California, Co-Conspirator 2 purchased
25 three separate money orders in the amounts of $1,000, $1,000, and
26 $700, to avoid financial institution reporting requirements.
27     <u>Overt Act No. 17</u>:  On February 28, 2022, in Los Angeles County,
28 within the Central District of California, Co-Conspirator 2 purchased

three separate money orders in the amounts of $1,000, $1,000, and $601.60, to avoid financial institution reporting requirements.

<u>Overt Act No. 18</u>:  On April 26, 2022, Co-Conspirator 1, using coded language in a LINE application message conversation, told Co-Conspirator 2 that he should obtain $3,000 worth of money orders from the United States Postal Service, and then $3,000 more another day.

FORFEITURE ALLEGATION

[31 U.S.C. § 5317]

1.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 31, United States Code, Section 5317, in the event of any defendant's conviction of the offense set forth in the sole count of this Information.

2.  The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  All property, real or personal, involved in the offense and any property traceable thereto; and

(b)  To the extent that such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section 5317(c)(1)(B), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding, or any portion thereof; (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the

/////

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                      BILAL A. ESSAYLI
                                      United States Attorney

*/s/ Lindsey Greer Dotson*

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

J. MARK CHILDS
Assistant United States Attorney
Chief, Transnational Organized
  Crime Section

CHRISTOPHER C. KENDALL
Assistant United States Attorney
Deputy Chief, Transnational
  Organized Crime Section

JEHAN KIM
Assistant United States Attorney
Deputy Chief, Transnational
  Organized Crime Section